## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RUSSELL UPKY,

      Plaintiff,

vs.                                                                          No. CIV 13-0553 JB/GBW

WAYNE LINDSEY, M.D.,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

    **THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion for Default Judgment and Request for Evidentiary Hearing, filed December 9, 2013 (Doc. 8)("Motion for Default Judgment"); (ii) Defendant Wayne Lindsey, M.D.'s Motion to Set Aside Clerk's Entry of Default, filed February 10, 2014 (Doc. 13)("Motion to Set Aside Clerk's Entry of Default"); and (iii) Defendant Wayne Lindsey, M.D.'s Motion for Extension of Time to File Answer, filed February 10, 2014 (Doc. 12)("Motion for Extension").  The Court held a hearing on July 17, 2014.  The primary issues are: (i) whether there is good cause to set aside the entry of default against Defendant Wayne Lindsey, M.D., that is, whether Lindsey willfully defaulted, whether setting aside the entry of default will prejudice Plaintiff Russell Upky, and whether Lindsey has a meritorious defense; and (ii) whether Lindsey has shown excusable neglect in failing to timely answer the Complaint for Medical Negligence Resulting in Personal Injury, filed June 14, 2013

---

[1]On September 15, 2014, the Court issued an Order, filed September 15, 2014 (Doc. 27)("Order"), in which it denied the Plaintiff's Motion for Default Judgment and Request for Evidentiary Hearing, filed December 9, 2013 (Doc. 8), granted Defendant Wayne Lindsey, M.D.'s Motion to Set Aside Clerk's Entry of Default, filed February 10, 2014 (Doc. 13), and granted Defendant Wayne Lindsey, M.D.'s Motion for Extension of Time to File Answer, filed February 10, 2014 (Doc. 12).  In the Order, the Court stated that it would "at a later date issue a Memorandum Opinion more fully detailing its rationale for these decisions."  Order at 1 n.1. This Memorandum Opinion and Order is the promised opinion.

(Doc. 1)("Complaint").  The Court will deny the Motion for Default Judgment, grant the Motion to Set Aside Clerk's Entry of Default, and grant the Motion for Extension.  The Court concludes that there is good cause to set aside the entry of default, because Lindsey mistakenly believed that his attorneys received the Complaint, and, thus, he did not willfully default.  Further, Upky has not established that he will be prejudiced by setting aside the entry of default, and Lindsey has shown that he has a meritorious defense by pointing to facts and evidence that, if a jury believes them, would establish that he was not medically negligent.  The Court concludes that Lindsey has also demonstrated excusable neglect in failing to answer the Complaint, because the delay has not prejudiced Upky and will not greatly impact judicial proceedings, and Lindsey acted in good faith when he mistakenly believed that his attorneys also received a copy of the Complaint.

## FACTUAL BACKGROUND

The Court takes the facts from the Complaint.  In December, 2008, Upky "was seen at Las Cruces Orthopaedic Associates for an injury to his left shoulder which had resulted in a full thickness rotator cuff tear."  Complaint ¶ 4, at 1.  Upky was not able to have surgery to repair the tear in December, 2008, because of "unrelated medical problems."  Complaint ¶ 4, at 1.  In May, 2010, Upky "agreed to undergo surgery at the Las Cruces Surgical Center as an out-patient for the rotator cuff tear and related problems."  Complaint ¶ 5, at 1-2.  He "was reported to be doing very well" post-operatively and was scheduled to begin physical therapy in June, 2010, but on June 22, 2010, he was "seen and admitted to Mountain View Regional Medical Center in Las Cruces, New Mexico, by Defendant Lindsey," because he had "been suffering increasing problems with the shoulder including recent drainage, pain, swelling and fever."  Complaint ¶¶ 5-7, at 2.  Upky had "drainage from the surgical site which had tested positive for staph

infection," and a "CT scan of the left shoulder on June 22, 2010[,] confirmed that he had an abscess accompanied with septic joint and suspected osteomyelitis in the shoulder."  Complaint ¶¶ 6-7, at 2.

Lindsey "knew or should have known that the condition present on June 22, 2010, required urgent care and treatment[,] including immediate surgical decompression and operation to address the septic infection in his shoulder," and further that Upky "required an infectious disease consultation and management of his left shoulder for the infection."  Complaint ¶ 9, at 2. Instead of performing surgery immediately, however, Lindsey waited until June 23, 2010, to perform the "arthroscopic incision and debridement of the left shoulder."  Complaint ¶ 10, at 2. Lindsey's "failures constitute medical negligence . . . as a matter of law."  Complaint ¶¶ 9-10, at 2.

Upky required follow-up care with Dr. Daniel Romanelli during the following months, during which time Upky "continued to experience severe and debilitating problems given that his shoulder infection had not been timely and appropriately treated."  Complaint ¶ 11, at 2-3. "Ultimately the mistreated and untreated shoulder infection required removal of all the medical devices ('hardware') which had been surgically implanted in Mr. Upky's body."  Complaint ¶ 12, at 3.  Upky "has been left with a full thickness tear of the shoulder and, as a result, suffers and will continue to suffer from a permanently torn and irreparable left rotator cuff."  Complaint ¶ 12, at 3.

## PROCEDURAL BACKGROUND

The Court will describe the procedural background in two parts.  First, the Court will describe the relevant timeline of events after Upky filed the Complaint, including the

communications between the parties' counsel.   The Court will then address the parties' arguments regarding the pending motions.

> ### 1.    __Procedural Timeline.__

Upky filed the Complaint on June 14, 2013.  Upky asserts that the Court has diversity jurisdiction under 28 U.S.C. § 1332, because he is an Oklahoma resident, Lindsey is a New Mexico resident,[2] and he asserts that the amount in controversy exceeds $75,000.00.  See Complaint ¶¶ 1-3, at 1.  Although Upky does not set forth a specific count, it appears that he is asserting a medical negligence claim against Lindsey for Lindsey's treatment of Upky.  See Complaint ¶¶ 9-13, at 2-3.

On June 3, 2013, Upky wrote a letter requesting a hearing before the New Mexico Medical Review Commission.  See Letter from James P. Lyle to Michael Rueckhaus, Acting Director of the New Mexico Medical Review Commission at 1, dated June 3, 2013, filed February 10, 2014 (Doc. 13-1).[3]  Hinkle, Hensley, Shanor & Martin, L.L.P. (the "Hinkle firm") represented Lindsey before the Medical Review Commission.  See Letter from Terry M. Ortega, Legal Assistant to William P. Slattery, to Michael Rueckhaus, dated June 12, 2013, filed February 24, 2014 (Doc. 15-1); Answer of Wayne C. Lindsey, M.D., Before the New Mexico Medical Review Commission, filed February 24, 2014 (Doc. 15-1 at 2)(stating "Wayne C. Lindsey, M.D., by and through his attorneys, Hinkle, Hensley, Shanor & Martin, L.L.P.," and

---

[2]Lindsey asserts that he is a Utah resident.  See Defendant Wayne Lindsey, M.D.'s Answer to Complaint for Medical Negligence Resulting in Personal Injury ¶ 2, at 1, filed February 10, 2014 (Doc. 13-6)("Proposed Answer").

[3]As part of the New Mexico Medical Malpractice Act, N.M. Stat. Ann. §§ 41-5-1 to -29, the New Mexico Medical Review Commission is designed "to provide panels to review all malpractice claims against health care providers covered by the Medical Malpractice Act."  N.M. Stat. Ann. § 41-5-14(A).  The Act provides that "[n]o malpractice action may be filed in any court against a qualifying health care provider before application is made to the medical review commission and its decision is rendered."  N.M. Stat. Ann. § 41-5-15(A).

signed by William P. Slattery); Affidavit of Disqualification Before the New Mexico Medical Review Commission, filed February 24, 2014 (Doc. 15-2)(including three affidavits that Zachary T. Taylor, one of the Hinkle firm attorneys representing Lindsey, signed)

The Medical Review Commission conducted a hearing on August 19, 2013.  See Motion for Default Judgment ¶ 2, at 1.  On the day of the hearing, James P. Lyle, Upky's attorney, asked someone from the Hinkle firm, likely Zachary T. Taylor, if he would accept service of the Complaint on Lindsey's behalf.  See Plaintiff's Response to Defendant Wayne Lindsey's Motion to Set Aside Clerk's Entry of Default at 2, filed February 24, 2014 (Doc. 15)("Response").[4] Lindsey's attorney "indicated that he would have to check with his client and would notify" Upky's counsel. Response at 2.  Mr. Slattery spoke with Mr. Lyle on two occasions after August 19, 2013; Mr. Lyle represents that "Mr. Slattery initially notified counsel for Plaintiff that he was authorized to accept service on behalf of his client," but that he "called back" that same day "and said his client had decided upon personal service," Response at 2, while Mr. Slattery states that, "[o]n both occasions, I advised Mr. Lyle that I was not authorized to accept service of the complaint on behalf of Dr. Lindsey," Affidavit of William P. Slattery, Esq. ¶ 4, at 1, dated March 7, 2014, filed March 7, 2014 (Doc. 16-1)("Slattery Aff.").

The District of New Mexico Clerk of the Court issued the Summons on October 25, 2013.  See Summons in a Civil Action at 1, dated October 25, 2013, filed December 9, 2013

---

[4]The Response states that Mr. Slattery attended the hearing and that Mr. Lyle asked Mr. Slattery if he would accept service.  See Response at 1-2.  Mr. Slattery states he was not present at the hearing, however, and that Mr. Taylor represented Lindsey at the hearing.  See Affidavit of William P. Slattery, Esq. ¶ 3, at 1, dated March 7, 2014, filed March 7, 2014 (Doc. 16-1).  At the hearing in this federal case, Mr. Slattery indicated that he did not ask Mr. Taylor whether he had spoken with Mr. Lyle at the Medical Review Commission hearing about accepting service on Lindsey's behalf, and that Mr. Taylor did not tell Mr. Slattery about any request from Mr. Lyle.  See Transcript of Hearing at 5:22-6:4 (Slattery), taken July 17, 2014 ("Tr.").

(Doc. 6)("Summons").  "The summons was delivered to the Utah County Sheriff's Department in Provo, Utah[,] for personal service upon the Defendant.  The summons, along with a copy of the Civil Complaint were served upon the Defendant on October 29, 2013."  Motion for Default Judgment ¶ 4, at 2.  See Certification of James O. Tracy, Sheriff of Utah County, at 2, dated October 31, 2013, filed December 9, 2013 (Doc. 6 at 2)(certifying that he "receiving the within and foregoing Summons and Complaint on 29th day of October, 2013, and that I served the same on: Wayne R. Lindsey MD . . . on: 29th day of October, 2013 at 15:44:00").

Lindsey's answer "was due on or before November 19, 2013."  Motion for Default ¶ 5, at 2.  Because Lindsey did not file an answer to the Complaint, Upky filed the Praecipe for Clerk's Entry of Default, filed December 9, 2013 (Doc. 7)("Praecipe"), requesting the Clerk of the Court to enter default against Lindsey pursuant to rule 55(a) of the Federal Rules of Civil Procedure, Praecipe at 1.  Upky also filed the Motion for Default Judgment, requesting the Court to enter default judgment and for a one-day evidentiary hearing to determine damages.  See Motion for Default Judgment ¶¶ 6-7, at 2.

On January 30, 2014, Mr. Lyle and David Lawrenz, another attorney at the Hinkle firm, appeared before the Honorable Carl Butkus, District Judge for the Second Judicial District of the State of New Mexico, in a different matter.  See Tr. at 4:9-13 (Slattery); id. at 38:19-20 (Lyle).  Mr. Lyle advised Mr. Lawrenz of the Motion for Default and that the Court had set a hearing.  See Tr. at 4:14-16 (Slattery); id. at 38:22-39:2 (Lyle)(stating that he told Mr. Lawrenz that Lindsey had been served, that Lindsey had not answered, and that he had sent a notice of the Motion for Default, but had not heard anything from Lindsey or the Hinkle firm).  Eleven days later, on February 10, 2014, Mr. Slattery filed the Motion for Extension of Time and the Motion

to Set Aside Clerk's Entry of Default.  <u>See</u> Motion for Extension at 1; Motion to Set Aside Clerk's Entry of Default at 1.

      2.      **<u>The Parties' Arguments</u>**.

      In the Motion for Extension of Time, Lindsey contends that, pursuant to rule 60 of the Federal Rules of Civil Procedure, the Court may extend the answer deadline "'if the party failed to act because of excusable neglect.'"  Motion for Extension of Time ¶ 1, at 1 (quoting Fed. R. Civ. P. 6(b)(1)(B)).  He explains that, when he was served with a copy of the Complaint and Summons, he "mistakenly believed that his counsel received a copy of these documents," and, thus, did not forward the documents to his counsel or call his counsel, nor did his counsel enter an appearance on his behalf.  Motion for Extension of Time ¶¶ 2-3, at 2.  Lindsey asserts that, although his failure to timely answer has resulted in a two-and-a-half month delay, "there has been no loss of evidence, nor has the delay resulted in any increased difficulties with discovery."  Motion for Extension of Time ¶ 4, at 2.  He explains that his "failure to timely serve his Answer to Plaintiff's Complaint was not intentional, nor did Dr. Lindsey seek tactical advantage by delaying his Answer."  Motion for Extension of Time ¶ 5, at 2.  Upky did not respond to the Motion for Extension of Time, but Lindsey explains that Upky "[p]resumably" opposes the Motion for Extension of Time, because Lindsey's two motions are "related and the relief requested" in the Motion for Extension of Time "is derivative of the relief sought in Dr. Lindsey's Motion to Set Aside Clerks' Entry of Default," to which Upky responded and opposes.  Defendant Wayne Lindsey, M.D.'s Reply in Support of Motion for Extension of Time to File Answer ¶ 2, at 1, filed March 7, 2014 (Doc. 17).

      In the Motion to Set Aside Clerks' Entry of Default, Lindsey explains that a court may set aside an entry of default for "good cause," pursuant to rule 55 of the Federal Rules of Civil

Procedure, that the standard is "'fairly liberal,' because the preferred resolution of any case is on the merits," and that the three primary factors in determining good cause include (i) "whether the default resulted from culpable conduct by the defendant" (ii); "whether the plaintiff will be prejudiced by setting aside the default"; and (iii) "whether the defendant has presented a meritorious defense."  Motion to Set Aside Clerks' Entry of Default at 3-4 (quoting Crutcher v. Coleman, 205 F.R.D. 581, 583 (D. Kan. 2001)).  As to the first factor, Lindsey asserts that he "did not willfully default on the claims" in the Complaint, but that he "mistakenly believed that his counsel" received a copy of the Complaint and Summons that he received.  Motion to Set Aside Clerks' Entry of Default at 4 (citing Affidavit of Wayne Lindsey, M.D., dated February, 2014, filed February 10, 2014 (Doc. 13-3)("Lindsey Aff.").   In a footnote to the section regarding Lindsey's culpable conduct, Mr. Slattery offers to pay Upky's costs associated with serving Lindsey at his home in Utah.  Motion to Set Aside Clerks' Entry of Default at 4 n.1.  On the second factor -- whether Upky will be prejudiced by setting aside the Entry of Default -- Lindsey reiterates that, although there has been a two-and-a-half-month delay, "there has been no loss of evidence, nor has the delay resulted in any increased difficulties with discovery."  Motion to Set Aside Clerks' Entry of Default at 4-5.  On the third factor -- whether Lindsey has presented a meritorious defense -- Lindsey "denies that he breached the standard of care in his treatment of Mr. Upky."  Motion to Set Aside Clerks' Entry of Default at 5.  He explains his defense:

> Dr. Lindsey states that he appropriately arranged for Mr. Upky's transfer to Mountain View Regional Medical Center and appropriately sought his admission to the hospital.  Dr. Lindsey timely got Mr. Upky into surgery on June 23, 2013[,] and performed an incision and debridement to clean the infected shoulder.  After the procedure, Dr. Lindsey ordered appropriate antibiotics for Mr. Upky and

arranged for PICC line for long-term antibiotic administration.[5]   Significantly, Dr. Romanelli noted that the antibiotics ordered by Dr. Lindsey were "more than sufficient for covering any potential problems" and were continued by Dr. Romanelli.   See July 1, 2010 Progress Note, [filed February 10, 2014 (Doc. 13-4)].

Dr. Romanelli performed a second washout procedure on July 2, 2010. After the second washout procedure, Mr. Upky did well until November 2010, when he had a recurrence of pain in his left shoulder.  Mr. Upky was diagnosed with a new rotator cuff repair, which was repaired by Dr. Romanelli on February 9, 2011.  See Operative Report, [dated February 9, 2011, filed February 10, 2014 (Doc. 13-5)].  Neither the pre-operative tests before the second repair, nor the surgery, indicated the presence of any latent infection in Mr. Upky's left shoulder. Id.  Dr. Romanelli did not find any signs of a recurrent or latent infection when he operated on Mr. Upky on February 9, 2011.  Id.

Dr. Lindsey presented these facts to the Medical Review Commission on August 20, 2013, and prevailed on Plaintiff's claims by a unanimous vote of six to zero.  See [Results of Panel Hearing, dated August 20, 2013, filed February 10, 2014 (Doc. 13-2)[6]].  Dr. Lindsey met the standard of care in this care and treatment of Mr. Upky and no act or omission by Dr. Lindsey caused Mr. Upky's injury or damages.  See [Defendant Wayne Lindsey, M.D's Answer to Complaint for Medical Negligence Resulting in Personal Injury, filed February 10, 2014 (Doc. 13-6)].

Motion to Set Aside Clerks' Entry of Default at 5-6.

---

[5]A "peripherally inserted central catheter (PICC or PIC line) is a form of intravenous access that can be used for a prolonged period of time (e.g. for long chemotherapy regimens, extended antibiotic therapy, or total parenteral nutrition)."  Peripherally inserted central catheter, Wikipedia, en.wikipedia.org/wiki/Peripherally_inserted_central_catheter (last visited Aug. 28, 2014).

[6]Upky argues that it is improper for Lindsey to introduce the findings of the Medical Review Commission to support his arguments.  See Plaintiff's Response to Defendant Wayne Lindsey's Motion to Set Aside Clerk's Entry of Default at 5 n.2, filed February 24, 2014 (Doc. 15)(citing N.M. Stat. Ann. § 41-4-20(D)("The report of the medical review panel shall not be admissible as evidence in any action subsequently brought in a court of law.")).  Lindsey replies that N.M. Stat. Ann. § 41-5-20 "seemingly distinguishes between the 'decision' of the panel and a 'report' generated by the medical review panel." Reply at 4 n.1. At the hearing, he explained that his understanding was that the "actual panel decision" cannot be offered into evidence, such as using the panel's decision in his defense at trial that he met the standard of care, but that he thought he could use the decision as "evidence to support our claim that we had a meritorious defense."  Tr. at 27:10-25 (Slattery).  Lindsey said that if his understanding is incorrect, he apologizes for submitting the Results of Panel Hearing.  See Tr. at 27:23-25 (Slattery).

Upky responds that "[t]his issue presents a blatant and mystifying example of professional disregard for the power and authority of the Court and the rights of litigants." Response at 1.  He initially focuses on the procedural timeline of the case, including that the Hinkle firm represented Lindsey at the Medical Review Commission hearing and that Lindsey insisted on personal service, which, in his view, indicates that "both the Defendant and Mr. Slattery were well aware that Mr. Slattery was not authorized to accept service on the Defendant's behalf and the Defendant would be expecting personal service by sheriff's deputies."  Response at 2.  Upky contends that Lindsey should have read the Summons and Complaint, and "taken whatever steps he felt appropriate to abide by his legal obligations and the power and authority of this Court," but instead, "for reasons not explained other than saying he thought his lawyer was going to take care of it," he "chose to do nothing."  Response at 3.

Pointing to the same three factors that Lindsey cites to establish good cause for setting aside the entry of default, Upky contends that the Court may consider other factors and that, "[i]f the default was the result of the defendant's culpable conduct, the district court may refuse to set aside the default on that basis alone."  Response at 4 (citing Dierschke v. O'Cheskey (In re Dierschke), 975 F.2d 181, 184 (5th Cir. 1992)).  Although noting that "default judgments are disfavored because they make use of the Court's power to enforce judgments without an actual determination on the merits," Upky contends that there are "times when a party's blatant disregard for the Court's rules and procedures make a default judgment appropriate."  Response at 4 (quoting Wilson v. Mazer, No. CIV 97-1288 JC/JHG, slip op. at 3 (D.N.M. March 27, 1998)(Conway, C.J.))(internal quotation marks omitted).  Upky argues that Lindsey has not presented a "viable excuse or explanation under these facts and circumstances which justify the Defendant's decision to refuse to allow his counsel of record to accept service, to insist on

personal service, and to then completely ignore his legal obligations as set forth on the documents served on him."  Response at 4-5.  Upky urges the Court to "send a clear message, not just to medical and other trained professionals, but to all people who engage in similar conduct."  Response at 5.

Lindsey replies that Upky's argument in the Response "is based upon his counsel's speculation regarding attorney-client privileged communications and Dr. Lindsey's presumed understanding of the legal process."  Defendant Wayne Lindsey, M.D.'s Reply in Support of Motion to Set Aside Clerk's Entry of Default at 1, filed March 7, 2014 (Doc. 16)("Reply").  Lindsey asserts that Upky has not established "any prejudice that would result from setting aside the default" and has not addressed "Lindsey's assertion of a meritorious defense."  Reply at 1-2.  Lindsey reiterates that he has met rule 55(c)'s good-cause standard, because he did not intentionally default or willfully fail to answer the Complaint, Upky has not demonstrated that he will be prejudiced by setting aside the clerk's entry of default, and he has articulated specific facts that, if proven at trial, would constitute a cognizable defense to Upky's claims.  See Reply at 2-4.

At the hearing on July 17, 2014, Lindsey described the case's procedural timeline before elaborating on the good-cause requirement for setting aside an entry of default.  See Transcript of Hearing at 2:20-7:23 (Slattery, Court), taken July 17, 2014 ("Tr.").  Regarding the first prong -- Lindsey's culpable conduct -- the Court questioned whether the Hinkle firm was at fault for failing to answer or to enter an appearance for Lindsey.  See Tr. at 9:10-25 (Court).  Mr. Slattery explained that his practice is to tell clients, "in the event that they're served with a complaint, that they need to notify me."  Tr. at 10:1-7 (Slattery).  Upky stated that he does not criticize how the Hinkle firm or Mr. Slattery specifically dealt with this case, but that his concern is with

Lindsey's culpability.  See Tr. at 33:2-20 (Court, Lyle).  In response to Upky's argument that, "[i]f the default occurred as a result of culpable conduct by the defendant, that . . . in and of itself can be enough" to justify entering default judgment, Lindsey asserted that the cases Upky cited "are much more egregious in terms of the defendant's conduct than Dr. Lindsey's conduct here." Tr. at 10:21-11:10 (Slattery).  For example, he attempted to distinguish Dierschke v. O'Cheskey (In re Dierschke), the case upon which Upky principally relied for the proposition that the Court needs to look only to the defendant's culpable conduct.  See Tr. at 13:17-22 (Slattery).  He noted that the three factors are not "talismanically applied," and that "the Court has substantial discretion in applying those factors, or considering those factors and others that the Court thinks were appropriate."  Tr. at 14:7-11 (Slattery).  Although the United States Court of Appeals for the Fifth Circuit stated that, "when the court finds an intentional failure of responsive pleadings there need be no other finding," Dierschke v. O'Cheskey (In re Dierschke), 975 F.2d at 184, Lindsey contended that his failure to file an answer "was a mistake on his part, it was not intentional," Tr. at 15:1-3 (Slattery).  Further, Lindsey pointed out that, in Dierschke v. O'Cheskey (In re Dierschke), the lawyer was also served and discussed the complaint with the client, yet did not answer, but that Mr. Slattery was not served in this case.  See Tr. at 15:4-10 (Slattery).  Lindsey then discussed Wilson v. Mazur and argued that the circumstances that the Honorable John E. Conway, then Chief Judge for the District of New Mexico, addressed were more egregious than the circumstances in this case.  See Tr. at 15:21-15 (Slattery).  Lindsey explained that, in Lindsey v. Mazur, the defendants sent a "Demand for More Definite Statement" to the plaintiffs, but never filed the motion following the plaintiffs' response. Wilson v. Mazur, slip op. at 2 n.1.  See Tr. at 16:11-17 (Slattery)(discussing Wilson v. Mazur).  Lindsey pointed out that the defendants also did not appear at the hearing on the motion for default

judgment.  See Tr. at 16:17-21 (Slattery).  Lindsey explained that Chief Judge Conway analyzed

the factors for entering default judgment and described the following portion of the opinion:

> In this case, default judgment is appropriate because Defendants have thumbed
> their noses at the Court and the legal process.  Defendants did not file an answer
> to Plaintiffs' Complaint; they filed frivolous "Notice[s] of Default" following the
> Clerk's entry of default; they filed affidavits claiming they were not parties to the
> case, and that they did not have an understanding of the case; and, finally, they
> did not attend the scheduled hearing.  It has also come to the Court's attention that
> Defendants recently had a default judgment entered against them by the
> Honorable Lorenzo F. Garcia for similar violations of the rules of civil procedure
> and Court directives.  See Apodaca v. Mazer, No. CIV 97-1019 LH/LFG (D.N.M.
> filed Jan. 20, 1998).  Consequently, default judgment will also be granted in this
> case.

Wilson v. Mazur, slip op. at 3.  See Tr. at 16:24-17:15 (Slattery).  Lindsey emphasized that, in

his view, the circumstances in Wilson v. Mazur "were much more egregious than what occurred

here."  Tr. at 17:16-18 (Slattery).

Lindsey explained that, "as he states in his affidavit, as a layperson, it was his impression

that those papers -- we would have received those papers at the same time that he did."  Tr. at

11:11-14 (Slattery).  Further, "once we heard from Mr. Lyle that the motion for default was filed

and that a hearing was pending, . . . we acted promptly" and filed the Motion for Extension of

Time and the Motion to Set Aside Clerk's Entry of Default in less than two weeks.  Tr. at

11:18-12:2 (Slattery, Court).  Anticipating Upky's argument that Lindsey, as a retired physician,

should have understood that he needed to tell his attorney that he had been served, Lindsey

pointed to Bicicletas Windsor, S.A. v. Bicycle Corp. of America, 783 F. Supp. 781 (S.D.N.Y.

1992)(Haight, J.), in which the Honorable Charles S. Haight Jr.,  United States District Judge for

the Southern District of New York, declined to find that the defendant's default was willful, even

though, in Lindsey's view, it involved "sophisticated businessmen" and "attorneys."  Tr. at

20:8-17 (Slattery).  Lindsey explained that, in that case, the defendant "suggested that it was

confused as to the amount of time that it had to respond," based on whether "service had personally occurred or had occurred by mail," and further, that there was a "delay in moving to set aside the default," but the Southern District of New York determined that, "while the actions of the client and the lawyer were to be condemned there as inattentive and negligent," it was "not prepared to call the default willful."  Tr. at 20:10-21 (Slattery).  Lindsey emphasized that Bicicletas Windsor, S.A. v. Bicycle Corp. of America involved "a more egregious confusion than Dr. Lindsey had . . . and more sophisticated individuals, but nonetheless, the Court didn't conclude that that was conduct that was culpable or intentional."  Tr. at 21:7-12 (Slattery).  He argued that, even if the Court finds that Lindsey acted culpably by "being served and taking no action," the Court should consider the other factors for good cause to set aside the entry of default.  Tr. at 17:18-24 (Slattery).  Lindsey noted that "the extreme sanction of default must remain a weapon of last rather than first resort, which can only be imposed upon a serious showing of willful default."  Tr. at 19:19-22 (Slattery).  He urged the Court to consider a lesser sanction than default, noting that he had already offered to pay for the cost of service and, further, that "an appropriate sanction would be for us to compensate Mr. Lyle for the fees also that were associated in pursuing his motion for default judgment."  Tr. at 19:23-20:7 (Slattery).

Regarding the second factor -- whether Upky will be prejudiced by setting aside the entry of default -- Lindsey argued that Upky "made no effort to suggest that there was any prejudice. There is a statement in his response that, well, surely, delay must cause prejudice," but he noted that "the case law is very clear that delay in and of itself is not prejudice, and I think we'd ask the Court to certainly find that there's no prejudice here to the plaintiff."  Tr. at 18:2-10 (Slattery). He noted that his failure to answer led to a two-and-a-half month delay, but argued that, as Judge Haight acknowledged in Bicicletas Windsor, S.A. v. Bicycle Corp. of America, delay in and of

itself is not sufficient to show prejudice.  See Tr. at 21:20-23 (Slattery).  Lindsey asserted that, to

show prejudice, cases refer "to the loss of evidence or increased difficulties with discovery," but

that Upky has not alleged any similar difficulties.  Tr. at 21:15-19 (Slattery).

Regarding the third factor -- whether Lindsey has a meritorious defense -- Lindsey

acknowledged that he must "make a showing of sufficient facts not in a conclusory fashion, facts

that would support a finding of a meritorious defense."  Tr. at 22:10-12 (Slattery)(citing In re

Stone, 588 F.2d 1316 (10th Cir. 1978)).  Lindsey reviewed the facts he set forth in the briefing,

including the Progress Note and Operative Report that he cited, and further explained what he

views to be a meritorious defense:

> [W]e presented sufficient detailed facts about Dr. Lindsey's care, that he promptly
> treated the patient, he promptly -- well, he promptly consulted with the patient the
> very next day, then he took the patient back to the operating room and drained
> what was apparently an abscess, infected abscess.  He started the long-term IV
> antibiotics, and certainly without any knowledge that I'd ever be in this position,
> Judge, we have Dr. Romanelli and the progress note saying that those antibiotics
> were sufficient.  And then . . . [in] Dr. Romanelli's operative report, and at the
> very outset of that report, he indicates that as he's going back to his second
> washout procedure, the lab results do not indicate that there is, in fact, any
> infection demonstrated by the lab result.

Tr. at 25:14-26:5 (Slattery).  Lindsey noted that, although he did not submit an expert's report,

the defendant's version of the facts are to be taken as true in considering whether to set aside an

entry of default.  See Tr. at 26:17-27:5 (Slattery).  Lindsey emphasized that Upky did not contest

that Lindsey has a meritorious defense, but instead Upky focused on whether Lindsey's conduct

was culpable.  See Tr. at 28:1-6 (Slattery).

After discussing the procedural timeline, see Tr. at 31:24-33:20 (Court, Lyle), Upky

argued that Lindsey's conduct "scream[s] out for nothing other than intentional disregard for the

power and authority of the Court," even though Lindsey filed an affidavit stating that he

mistakenly believed that his counsel received a copy of the Complaint and Summons, Tr. at

33:21-34:16 (Court, Lyle).   In Upky's view, Lindsey insisted on personal service, which, although appropriate under the Federal Rules of Civil Procedure, comes with "consequences." Tr. at 39:16 (Lyle).   See id. at 34:21-35:3 (Lyle).   Upky contended that Lindsey "insisted on personal service," but then decided not to do anything.   Tr. at 39:20-21 (Lyle).   In response to Lindsey's assertion that he was mistaken, Upky argued that,

> on the record before the Court, we have [an] intentional decision, serve me personally.   Come to Utah, serve me.   Okay?   We served him.   Intentional disregard?   "Well, gee, I thought my lawyers were going to take care of it"?   Sorry.   That's not the game you're playing now.   You're playing the game where you insisted on personal service, which means you have the responsibility under the law to answer.

Tr. at 42:2-10 (Lyle).   Upky urged the Court to hold Lindsey "accountable for the consequences of his decisions."   Tr. at 42:15-16 (Lyle).

Lindsey responded that Upky was "speculating about what the attorney/client privileged conversations were."   Tr. at 43:1-2 (Slattery).   Mr. Slattery explained that he tells his clients to contact him if they get served, although Lindsey did not contact him in this case, but continued that Lindsey's affidavit is unrefuted, which states that Lindsey mistakenly believed that the papers he received would also be served on the Hinkle firm.   See Tr. at 43:2-10 (Slattery).

The Court said it was inclined to grant the Motion for Extension of Time and Motion to Set Aside Clerk's Entry of Default.   See Tr. at 44:2-4 (Court).   The Court said that, with the Lindsey Aff. and information regarding the Hinkle firm's usual practice, it would not make the additional leap that would be required to find there was a culpable state of mind by saying that Lindsey was lying in his affidavit.   See Tr. at 44:4-16 (Court).   The Court noted that Lindsey could have believed that Mr. Lyle would continue to serve documents on the Hinkle firm, which, in this case, was a mistaken assumption.   See Tr. at 44:24-45:6 (Court).   Next, the Court noted that, although there was some delay, Upky had not demonstrated any prejudice.   See Tr. at

45:7-19 (Court).  The Court also explained that, although not sure whether the Medical Review

Commission's decision should have been submitted, it would be difficult to ignore the

information, enter default judgment, and prevent Lindsey from presenting his defense.  See Tr. at

45:20-46:4 (Court).   Regarding sanctions, the Court said that it would probably rest on the

cost-shifting sanctions that Mr. Slattery offered, including paying the cost of serving Lindsey and

the cost of Mr. Lyle briefing and arguing the default issues, and would thus allow Lindsey to

plead affirmative defenses.  See Tr. at 47:5-48:1 (Court, Slattery, Lyle).

## LAW REGARDING DEFAULT JUDGMENT

Rule 55 of the Federal Rules of Civil Procedure sets out a two-step process for a default

judgment.  First, a party must obtain a Clerk's entry of default.  See Fed. R. Civ. P. 55(a) ("When

a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise

defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's

default."); Watkins v. Donnelly, 551 F. App'x 953, 958 (10th Cir. 2014)(unpublished)[7]("Entry of

default by the clerk is a necessary prerequisite that must be performed before a district court is

---

[7]Watkins v. Donnelly is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Watkins v. Donnelly, Kechi Tp. V. Freightliner, LLC, 592 F. App'x 657 (10th Cir. 2014)(unpublished), Pinson v. Equifax Credit Information Services, Inc., 316 F. App'x 744 (10th Cir. 2009)(unpublished), United States v. $285,350.00 in U.S. Currency, 547 F. App'x 886 (10th Cir. 2013)(unpublished), and Meyer v. Gibson, 17 F. App'x 821 (10th Cir. 2001)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

permitted to issue a default judgment.").  Second, the party must either request the clerk to enter

default judgment when the claim is for "a sum certain or a sum that can be made certain by

computation," Fed. R. Civ. P. 55(b)(1), or, "[i]n all other cases, the party must apply to the court

for a default judgment," Fed. R. Civ. P. 55(b)(2).

"The court may set aside an entry of default for good cause, and it may set aside a default

judgment under Rule 60(b)."  Fed. R. Civ. P. 55(c).  "[T]he good cause required by Fed. R. Civ.

P. 55(c) for setting aside entry of default poses a lesser standard for the defaulting party than the

excusable neglect which must be shown for relief from judgment under Fed. R. Civ. P. 60(b)."

Pinson v. Equifax Credit Info. Servs., Inc., 316 F. App'x 744, 750 (10th

Cir. 2009)(unpublished)(quoting Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115

F.3d 767, 775 n.6 (10th Cir. 1997)).  The distinction between setting aside an entry of default and

setting aside a default judgment "reflects the different consequences of the two events and the

different procedures that bring them about."  10A Charles Alan Wright, Arthur R. Miller & Mary

Kay Kane, Federal Practice and Procedure § 2692, at 83-84 (3d ed. 1998).

> [T]he clerk or the court may enter a default upon the application of the
> nondefaulting party.  The entry simply is an official recognition of the fact that
> one party is in default, as, for example, for failure to comply with the rules, to
> appear as scheduled, or to prosecute the case with due diligence.  The entry is an
> interlocutory step that is taken under Rule 55(a) in anticipation of a final
> judgment by default under Rule 55(b).
>
> In sharp contrast, a final default judgment is not possible against a party in
> default until the measure of recovery has been ascertained, which typically
> requires a hearing, in which the defaulting party may participate; in some
> situations, a jury trial may be made available to determine an issue of damages.
> Moreover, the entry of a default judgment is a final disposition of the case and an
> appealable order.
>
> . . . .
>
> Additional differences between relief from the entry of a default and from
> a default judgment appear in the grounds that will support the motion being

granted.  Stated generally, the defaulting party is not entitled to relief from a judgment as a matter of right under Rule 60(b).  The movant must present a justification supporting the relief motion and must establish his contentions if challenged.  Although whether relief will be granted is a matter within the sound discretion of the trial court, the vacation of a default judgment is subject to the explicit provisions of Rule 60(b), which places additional restraints upon the court's discretion.  The motion to set aside a default entry, on the other hand, may be granted for "good cause shown," which gives a court greater freedom in granting relief than is available in the case of default judgments.

10A Wright et al., supra, at 84-88 (footnotes omitted).

While there are some differences between setting aside the entry of default and setting aside a default judgment, there are some important similarities, including that courts may consider the same factors: whether the party willfully defaulted, whether setting aside the entry of default or default judgment would prejudice the non-movant, and whether the movant has presented a meritorious defense.  See Pinson v. Equifax Credit Info Servs., Inc., 316 F. App'x at 750 ("In deciding whether to set aside an entry of default, courts may consider, among other things, 'whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented.'"  (quoting Dierschke v. O'Cheskey (In re Dierschke), 975 F.2d at 183)); United States v. $285,350.00 in U.S. Currency, 547 F. App'x 886, 887 (10th Cir. 2013)(unpublished)("Three requirements must be met when setting aside a default judgment under Rule 60(b): '(1) the moving party's culpable conduct did not cause the default; (2) the moving party has a meritorious defense; and (3) the non-moving party will not be prejudiced by setting aside the judgment.'" (quoting United States v. Timbers Pres., 999 F.2d 452, 454 (10th Cir. 1993), abrogated on other grounds by Degen v. United States, 517 U.S. 820, 825 (1996)).  The Tenth Circuit has, at times, listed two factors rather than three for the standard in setting aside a default judgment:

Rule 60(b) of the Federal Rules of Civil Procedure permits relief from a final judgment only if the movant can demonstrate justifiable grounds, including

- 19 -

mistake, inadvertence, surprise or excusable neglect.  In the case of default judgments, courts have established the further requirement that a movant demonstrate the existence of a meritorious defense.  E. g., Gomes v. Williams, 420 F.2d 1364, 1366 (10th Cir. 1970).  A 60(b) motion thus comprehends two distinct aspects[:] justification for relief and a meritorious defense.

In re Stone, 588 F.2d at 1319.  See Sawyer v. USAA Ins. Co., 839 F. Supp. 2d 1189, 1230 (D.N.M. 2012)(Browning, J.)(setting aside a default judgment, because, "when a plaintiff fails to properly serve a defendant, a default judgment is void and should be set aside under rule 60(b)(4)").  "Although how these factors will be evaluated and weighed lies within the discretion of the trial court to a considerable degree, . . . federal courts are willing to grant relief from a default entry more readily and with a lesser showing than they are in the case of a default judgment."  10A Wright et al., supra, at 90 (footnotes omitted).  "The standard for setting aside an entry of default under Rule 55(c) is fairly liberal because '[t]he preferred disposition of any case is upon its merits and not by default judgment.'"  Crutcher v. Coleman, 205 F.R.D. 581, 584 (D. Kan. 2001)(Vratil, J)(quoting Gomes v. Williams, 420 F.2d 1364, 1366 (10th Cir. 1970)).  See Applied Capital, Inc. v. Gibson, CIV 05-98 JB/ACT, 2007 WL 5685131, at *20-23 (D.N.M. Sept. 27, 2007)(Browning, J.)(liberally construing a pro se defendant's motion to dismiss as a motion to set aside the default, but concluding that the pro se defendant did not show good cause for the Court to set aside the entry of default, because although setting aside the entry of default would not prejudice the plaintiff, the pro se defendant was "fully aware of the need to answer within the given time limitation and chose not to respond timely," and he failed to appear at a hearing to support his allegation that he had a meritorious defense).

"Default judgments are a harsh sanction."  Ruplinger v. Rains (In re Rains), 946 F.2d 731, 732 (10th Cir. 1991).  The Court has noted that, "[b]ecause default judgment is a harsh sanction involving a court's power to enter and enforce judgments regardless of the merits of a

case, courts do not favor such a sanction 'purely as a penalty for delays in filing or other procedural error.'"  Noland v. City of Albuquerque, CIV 08-0056 JB/LFG, 2009 WL 2424591, at *1 (D.N.M. June 18, 2009)(Browning, J.)(quoting Ruplinger v. Rains (In re Rains), 946 F.2d at 733).

> [S]trong policies favor resolution of disputes on their merits: [T]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.  In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights.  The default judgment remedy serves as such a protection.

Ruplinger v. Rains (In re Rains), 946 F.2d at 732-33 (citations omitted)(internal quotation marks omitted).  See Noland v. City of Albuquerque, 2009 WL 2124591, at *1 (denying motion for default judgment, because the counsel for the defendant City of Albuquerque "entered an appearance three days after Noland filed his motion for default judgment," and, thus, the Court could not "reasonably say that the City of Albuquerque is an essentially unresponsive party, that the adversary process has been halted, or that Noland faces interminable delay because of the City of Albuquerque's actions").

## LAW REGARDING EXTENSIONS OF TIME

Rule 6(b) of the Federal Rules of Civil Procedure governs the circumstances under which a court can grant a party an extension of time to perform a specific act.  The rule states:

**(b)     Extending Time.**

(1)     *In General*.  When an act may or must be done within a specified time, the court may, for good cause, extend the time:

(A)     with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or

(B)     on motion made after the time has expired if the party failed to act because of excusable neglect.

> **(2)      Exceptions.**  A court must not extend the time to act under Rules
> 50(b) and (d), 52(b), 59(b), (d), and (e), and 60(b).

Fed. R. Civ. P. 6(b) (bold in original).  "Good cause," necessary for an extension of time under

rule 6(b)(1)(A),  "generally means a substantial reason amounting in law to a legal excuse for

failing to perform an act required by law."  Black's Law Dictionary 692 (6th ed. 1990).  See

Black's Law Dictionary 251 (9th ed. 2009)("**good cause**. . . .  A legally sufficient reason.").

Showing good cause for an extension of time is not a particularly demanding requirement.  See

United States v. Bd. of Cnty. Comm'rs, No. CIV. 08-0501 JB/WPL, 2010 WL 965607, at *4

(D.N.M. February 18, 2010)(Browning, J.)(granting an extension of time for good cause when

"many of the impediments to timely filing a response . . . were the result of poor

decision-making on the part of Ramirez' counsel," while "others were seasonal circumstances

that a party filing a dispositive motion on Christmas Eve might foresee the opposing party

raising"); United States v. Portillo-Quezada, Nos. 03-20051, 08-2295, 2010 WL 396309, at *1

(D. Kan. Jan. 27, 2010)(finding good cause where attorney argued only that he "needs additional

time to contact a witness for the Government at the trial of this case who may recant or change

her testimony in material respects.  Completion of research and drafting of the memorandum in

support is also needed"); Weingarten v. Optima Commc'n Sys., Inc., 544 F. Supp. 2d 193, 196

n.1 (S.D.N.Y. 2008)("Under Rule 6(b)(1)(A) . . . the court may, for good cause, extend the time

to move if a request is made before the original time period expires.").

On the other hand, "a finding of excusable neglect under Rule 6(b)[(1)(B)] requires both

a demonstration of good faith by the parties seeking the enlargement and also it must appear that

there was a reasonable basis for not complying within the specified period."  In re Four Seasons

Sec. Law Litig., 493 F.2d 1288, 1290 (10th Cir. 1974).  See Putnam v. Morris, 833 F.2d 903, 905

(10th Cir. 1987)("[S]ome showing of good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified is normally required." (internal quotation marks and emphasis omitted)).  "[I]t is well established that inadvertence, ignorance of the rules, and mistakes construing the rules do not constitute excusable neglect for purposes of Rule 6(b)."  Quigley v. Rosenthal, 427 F.3d 1232, 1238 (10th Cir. 2005).  Excusable neglect, therefore, is a higher burden than good cause.

## ANALYSIS

The Court will deny the Motion for Default Judgment, grant the Motion for Extension of Time, and grant the Motion to Set Aside Clerk's Entry of Default.  The Court concludes that there is good cause to set aside the entry of default, because Lindsey did not willfully default, Upky will not be prejudiced if the Court sets aside the entry of default, and Lindsey has presented a meritorious defense.  The Court also concludes that Lindsey failed to answer the Complaint because of excusable neglect.  Lindsey acted in good faith, because, although mistaken, he believed that his counsel also received a copy of the Complaint and Summons.  His mistaken belief is a reasonable basis for not acting within the time prescribed, and, further, allowing Lindsey to answer will not prejudice Upky or greatly impact the judicial proceedings.

## I.     THERE IS GOOD CAUSE TO SET ASIDE THE ENTRY OF DEFAULT.

In considering whether to grant the Motion to Set Aside Clerk's Entry of Default, the Court may consider: (i) whether the default was willful; (ii) whether setting the entry of default aside would prejudice Upky; and (ii) whether Lindsey has presented a meritorious defense, as well as other factors the Court considers appropriate.  See Pinson v. Equifax Credit Info. Servs., Inc., 316 F. App'x at 750 (citing Dierschke v. O'Cheskey (In re Dierschke), 975 F.2d at 183).

- 23 -

Lindsey did not willfully default, and Upky will not be prejudiced if the Court sets aside the entry of default.  Lindsey has also presented a meritorious defense.

> ### A.   LINDSEY DID NOT WILLFULLY DEFAULT.

Upky focuses most of his energy arguing that Lindsey willfully defaulted when he insisted that he be personally served, rather than allowing his attorneys to accept service, and then did not tell his attorneys that he had been served with the Complaint and Summons, or later with the Praecipe and Motion for Default Judgment.  In an affidavit, however, Lindsey explains that he "mistakenly believed" that his attorneys also received a copy of the Complaint, Summons, Praecipe, and Motion for Default Judgment, and that he "did not willfully default on the claims" against him.  Lindsey Aff. ¶¶ 5-6, at 1-2.  Lindsey's confusion is similar to the defendant's confusion in Bicicletas Windsor, S.A. v. Bicycle Corp. of America, where the defendant -- Bicycle Corp. of America ("BCA") -- failed to enter an appearance based on confusion about how much time it had to respond, and further delayed six weeks before moving to set aside the default.  See 783 F. Supp. at 788.

> [W]hile BCA's actions are to be condemned as inattentive and negligent, the Court is not prepared to call the default 'willful.'  BCA certainly did not act with dispatch at any stage of this case.  When deciding whether to hold a defendant in default, however, the standard the Court must apply is not carelessness, but willfulness.  I am not prepared to say that BCA committed a willful default, particularly given the admonition that "all doubts should be resolved in favor of those seeking relief under Rules 55(c) and 60(b)."

783 F. Supp. at 788 (quoting Davis v. Musler, 713 F.2d 907, 915 (2d Cir. 1983)).

Here, Upky has not offered any evidence that Lindsey's statement that he thought his attorney was receiving the materials is a false statement.  Thus, the Court accepts the statement as true.  The Court also believes Lindsey's assumption was reasonable.  He had just gone through a proceeding before the New Mexico Medical Review Commission and was represented

by counsel.  His counsel had received everything during that process.  It was reasonable for him to assume that Upky's counsel would continue to send the materials to his lawyers in the civil suit as well.  Some plaintiff's lawyers do so as a matter of course to avoid this very situation.  Although Upky was not obligated to do so, of course, the failure to do so makes it more difficult to say that Lindsey willfully defaulted.  That Lindsey is a medical doctor does not make him an expert on the nuances of the service of documents between and on opposing counsel.  And his insistence on personal service, while a bit hard ball, is a separate issue from assuming his counsel was also receiving the papers.  Everyone insisted on and exercised their rights, and the result was that the layperson made an incorrect assumption.  It strikes the Court as careless at best that Lindsey would insist on personal service and then assume that he did not need to inform his attorneys about the Complaint or subsequent Motion for Default Judgment.  The Court will resolve any doubts in Lindsey's favor.  The Court is not prepared to call Lindsey's default "willful" when he has sworn in his affidavit that he mistakenly believed that his attorneys had also received the documents and that statement remains unrefuted.

### B. UPKY WILL NOT BE PREJUDICED IF THE COURT SETS ASIDE THE ENTRY OF DEFAULT.

Under the second prong, the only prejudice that Upky has alleged is that "[t]he additional delay imposed by the Defendant's cavalier attitude toward these proceeding[s] cannot help but to prejudice the Plaintiff's claims."  Response at 5.  Upky's allegation of delay is insufficient to establish that setting aside the entry of default would prejudice him.  "[T]he delay caused by reopening a judgment does not itself constitute prejudice.  Rather, it must be shown that delay will 'result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion.'"  Bicicletas Windsor, S.A. v. Bicycle Corp. of Am., 783 F. Supp. at 788 (citing Davis v. Musler, 713 F.2d at 916).  Setting aside the entry of default will

not thwart Upky's recovery or remedy, and he has not argued that it will result in loss of evidence, increased difficulties in discovery, or provide a greater opportunity for fraud and collusion.  See 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2699, at 169 (3d ed. 1998).  Further, Mr. Slattery has offered to pay Upky's costs in serving Lindsey, as well as Mr. Lyle's costs in briefing and arguing the entry of default, and these cost-shifting mechanisms remove the additional costs that Lindsey's delay imposed.  In other words, the Court can, by adopting these cost-shifting measures, mitigate any prejudice that Upky may have incurred.  The Court concludes that Upky has not demonstrated any prejudice that would persuade the Court to enter default judgment.

### C.   LINDSEY HAS A MERITORIOUS DEFENSE.

Regarding whether Lindsey has a meritorious defense, Lindsey has submitted several documents for the Court to consider, including the July 1, 2010 Progress Note from Romanelli, the Operative Report, and the Results of Panel Hearing.  He has also set forth facts in the Motion to Set Aside Clerk's Entry of Default alleges that he acted timely by operating on Upky on June 23, 2013, and that he ordered an appropriate amount of antibiotics, as Romanelli confirmed in the July 1, 2010 Progress Note.  The primary issue is how much of this information the Court may consider in determining whether Lindsey has shown that he has a meritorious defense.  The Court will focus primarily on the Results of Panel Hearing, because the parties disagree whether the Court may consider it as evidence.  The Court concludes that N.M. Stat. Ann. § 41-5-20(D) bars the Results of Panel Hearing from being admitted into evidence.  Even though state-law procedural provisions do not bind the Court, in a diversity action, state substantive law does.  Even though the Court will not consider the Results of Panel Hearing, the Court concludes that Lindsey has set forth a meritorious defense in this case.

1.     **The Results of the Panel Hearing Constitute a Report of the Medical Review Panel, Which Would Not Be Admissible Evidence in State Court.**

The Results of Panel Hearing indicates that, "[w]ith regard to the question as to whether there was substantial evidence of professional negligence on the part of Wayne C. Lindsey, M.D., the panel found that there was not evidence of professional negligence with a vote of 6 to 0."  Results of Panel Hearing at 1.  Although the panel's decision provides some evidence that Lindsey was not negligent in treating Upky, the parties disagree whether the Court may consider it as evidence that Lindsey has a meritorious defense.

First, the Court concludes that, although Lindsey is correct that N.M. Stat. Ann. § 41-5-20 refers to both "decisions" and "reports," subsection (D) regarding the admissibility of reports as evidence "in any action subsequently brought in a court of law" covers documents that concern a panel's decision.  In this case, the Results of Panel Hearing falls within the category of a report.  The statute provides:

A.     The deliberations of the panel shall be and remain confidential.  Upon consideration of all the relevant material, the panel shall decide only two questions:

(1)     whether there is substantial evidence that the acts complained of occurred and that they constitute malpractice; and

(2)     whether there is a reasonable medical probability that the patient was injured thereby.

B.     All votes of the panel on the two questions for decision shall be by secret ballot.  The decision shall be by a majority vote of those voting members of the panel who have sat on the entire case.  The decision shall be communicated in writing to the parties and attorneys concerned and a copy thereof shall be retained in the permanent files of the commission.

C.     The decision shall in every case be signed for the panel by the chairman, who shall vote only in the event the other members of the panel are evenly divided, and shall contain only the conclusions reached by a majority of its

members and the number of members, if any, dissenting therefrom; provided, however, that if the vote is not unanimous, the majority may briefly explain the reasoning and basis for their conclusion, and the dissenters may likewise explain the reasons for disagreement.

D.     The report of the medical review panel shall not be admissible as evidence in any action subsequently brought in a court of law.  A copy of the report shall be sent to the health care provider's professional licensing board.

E.     Panelists and witnesses shall have absolute immunity from civil liability for all communications, findings, opinions and conclusions made in the course and scope of duties prescribed by the Medical Malpractice Act [this article].

F.     The panel's decisions shall be without administrative or judicial authority and shall not be binding on any party.  The panel shall make no effort to settle or compromise any claim nor express any opinion on the monetary value of any claim.

N.M. Stat. Ann. § 41-5-20.  Although the statute refers to a panel "decision" in subsection (C), a panel "report" in subsection (D), and "decisions" in subsection (F), it seems that a report includes the decision.  In (C), the decision must be "signed," suggesting it is a document, so any distinction between a written opinion and an oral description of the holding is not possible, because the statute requires the decision to be reduced to writing even if it is initially given orally.  The statute does not explain what a panel may do to prepare a report, but rather gives details as to when a panel may elaborate on its decision: when the decision is not unanimous.

From the statute, it is unclear what a report entails.  The panel hearings are "informal and no official transcript" is made.  N.M. Stat. Ann. § 41-5-19.  The report, thus, does not include a transcript of the proceedings.  Moreover, it does not include information from the panel members' deliberations, which must remain confidential.  See N.M. Stat. Ann. § 41-5-20(A) ("The deliberations of the panel shall be and remain confidential.").  In Salazare v. St. Vincent Hospital, 1980-NMCA-095, 631 P.2d 315, aff'd in part, rev'd in part sub nom. St. Vincent Hospital v. Salazar, 1980-NMSC-124, 619 P.2d 823, the plaintiff sought to take the deposition of

a panel member of the Medical Review Commission. <u>See</u> 1980-NMCA-095, ¶ 1. The Court of Appeals of New Mexico held that a panel member could not be deposed about the panel's deliberations, which were confidential, but that she could be deposed about a witness' testimony, which was not confidential. <u>See</u> 1980-NMCA-095, ¶ 19. The Court of Appeals of New Mexico equated the panel's deliberations to that of a jury. <u>See</u> 1980-NMCA-095, ¶ 12 ("[W]e think, that the Legislature intended . . . that the give-and-take of the panel's deliberations, after it has heard the presentation of the parties, be as open and uninhibited as are a jury's deliberations at the end of a court trial."). The Supreme Court of New Mexico affirmed this portion of the Court of Appeals of New Mexico's decision:

> In reversing the trial court, the Court of Appeals held that the privilege applied to the panel's deliberations and any report made by the panel, but not to testimony heard by the panel. We agree with the reasoning and result reached by the Court of Appeals in Part I of its decision and affirm.

<u>St. Vincent Hosp. v. Salazar</u>, 1980-NMSC-124, ¶ 4, 619 P.2d 823. This reasoning, and the statute's text, suggests that the panel's deliberations are completely confidential and are not part of the report to which N.M. Stat. Ann. § 41-5-20 refers.

If the report does not include evidence presented at the hearing -- or at least not the testimonial evidence -- and does not refer to the panel's deliberations, it is unclear what it includes. A panel is not required to explain its reasoning for its decision unless its vote is not unanimous. <u>See</u> N.M. Stat. Ann. § 41-5-20(C). The panel's reasoning is, thus, not necessarily part of its report, because the panel is not required to explain its reasoning in every case. The one thing that the Court believes must be included in the report is the panel's decision. Without the panel's decision, the report would be useless to "the health care provider's professional licensing board" to which the report is sent. N.M. Stat. Ann. § 41-5-20(D). If every report contained evidence, the panel's reasoning, and its deliberations, it may be of assistance to a

licensing board in the absence of the panel's decision, because the licensing board could make its own, independent determination.   The report may, however, lack evidence, the panel's deliberations, and the panel's reasoning.  It is hard to imagine that such a report would be helpful to a professional licensing board, unless the board knew the panel's decision.  See N.M. Stat. Ann. § 41-5-20(C) ("The decision shall in every case be signed for the panel by the chairman . . . .")  The one document which a panel is required to produce is its decision.  The Court concludes that, because a report may be pointless without the decision, the decision must be included in the report.

The question then is whether one part of a report -- the panel's decision -- may be admitted into evidence or if subsection (D)'s admissibility prohibition covers the entire report. Because a report's general prohibition against admissibility would be nullified if the report could be introduced into evidence in a piecemeal fashion, subsection (D)'s prohibition  must cover the entire report, including the panel's decision.  Moreover, because a report may lack evidence, the panel's deliberations, and the panel's reasoning, the report may consist solely of the decision, or, at least, the decision will be the report's key part.  It would be illogical to prohibit the admissibility of the report, but then allow admission of the only part of the report that matters. Accordingly, N.M. Stat. Ann. § 41-5-20(D)'s inadmissibility provision covers the panel's decision, even if the report is a different document than the report.

### 2.     N.M. Stat. Ann. § 41-5-20(D) Applies in Federal Court.

"In a federal court diversity case, '[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.'" James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1216-17 (10th Cir. 2011)(quoting Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78 (1938)("Erie")).  The issue is whether the Court,

as a federal district court sitting in diversity, should apply New Mexico's statute barring the admission of the panel's results, or whether it should apply the Federal Rules of Evidence to determine the admissibility of the panel's result.  As the Tenth Circuit acknowledged, this issue is a "classic civil procedure question -- in the face of a conflicting state statute, when does a federal court sitting in diversity apply federal law?"  Sims v. Great Am. Life Ins. Co., 469 F.3d 870, 879 (10th Cir. 2006).  Although on its face this question appears to implicate Erie, the Tenth Circuit has explained that Congress enacted the Federal Rules of Evidence and that the substance/procedure dichotomy embodied in the Erie doctrine does not apply to acts of Congress.  See Sims v. Great Am. Life Ins. Co., 469 F.3d at 879.  Thus, the federal courts are to apply the Federal Rules of Evidence, at least the Federal Rules of Evidence that exist as originally enacted.  See Sims v. Great Am. Life Ins. Co., 469 F.3d at 879-880 ("[W]e are persuaded that Erie is inapplicable to the Federal Rules of Evidence" as originally enacted).[8]

---

[8]The Tenth Circuit noted that "a number of the Federal Rules of Evidence have been amended since 1975," and clarified that its decision did not "address how these amendments affect the reach of either the Rules Enabling Act or the Rules of Decision Act."  Sims v. Great Am. Life Ins. Co., 469 F.3d at 879 n.5.  Some federal courts have applied Erie to determine if a state law governing the admissibility of evidence is substantive or procedural, and thus, whether to apply the state law or the Federal Rules of Evidence.  See, e.g., Wray v. Gregory, 61 F.3d 1414, 1417 (9th Cir. 1995)(per curiam)(applying the Erie doctrine and concluding that Nevada's medical malpractice provisions addressing the admissibility of screening panel findings in court were substantive, and, thus, applying the state statute rather than the Federal Rules of Evidence to determine the panel's conclusions' admissibility).  The Honorable Linda Hodge McLaughlin, United States District Judge for the Central District of California, sitting by designation, wrote a concurring opinion in Wray v. Gregory, disagreeing that Erie applies to the Federal Rules of Evidence.  See 61 F.3d at 1421 (McLaughlin, J., concurring)("Therefore, the Federal Rules of Evidence are not subject to the Rules of Decision Act or to Erie.").  Judge McLaughlin did not discuss the need to address whether the Federal Rule of Evidence at issue has been amended since originally enacted.  Instead of assuming that Erie applies to the admissibility issue before the Court, like the per curiam decision in Wray v. Gregory, or assuming that Federal Rules of Evidence always apply, like the concurring opinion in Wray v. Gregory, the Court will follow the Tenth Circuit's analytical structure in Sims v. Great American Life Insurance Co., asking first if the Federal Rule of Evidence is an Act of Congress, and, if so, then applying the Federal

That is not to say, however, that a federal court may ignore state evidentiary rules or statutes proscribing the admissibility of evidence; rather, the Tenth Circuit explained that, "[w]here a state law excludes certain evidence in order to effect substantive policy considerations, Rule 401 acts to exclude the evidence since the proposition for which the evidence is submitted is not properly provable and, therefore, irrelevant to the claim."  469 F.3d at 881.  Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Under the Tenth Circuit's guidance in Sims v. Great American Life Insurance Co., state substantive law informs whether a fact is of consequence.  See 469 F.3d at 882.

> For example, state law defines the elements and defenses of a cause of action in a diversity case.  If, in such a case, a defendant proffers evidence supporting a defense that is no longer permitted by state statute, that proffer is of no consequence to the action and therefore not properly provable.

469 F.3d at 882.  The analysis thus turns on the distinction between procedural and substantive law, which the Tenth Circuit describes in further detail:

> "A pure rule of evidence . . . is concerned solely with accuracy and economy in litigation . . . ."  Barron v. Ford Motor Co., 965 F.2d 195, 199 (7th Cir. 1992).  Such rules "are addressed to lawyers and judges in their professional roles and govern the means by which disputes regarding the content or application of substantive rules should be resolved.  The purpose of these rules is to achieve accuracy, efficiency, and fair play in litigation, without regard to the substantive interests of the parties."  Michael Lewis Wells, The Impact of Substantive Interests on the Law of Federal Courts, 30 Wm. & Mary L. Rev. 499, 504 (1989).
>
> As John Hart Ely observed,
>
> > [A] procedural rule is . . . one designed to make the process of litigation a fair and efficient mechanism for the resolution of disputes.  Thus, one way of doing things may be chosen over another because it is thought to be more likely to get at the truth, or better calculated to give the parties a fair opportunity to present

---

Rule of Evidence and considering whether the Federal Rule of Evidence takes state law into consideration.

> their sides of the story, or because, and this may point quite the
> other way, it is a means of promoting the efficiency of the process.

John Hart Ely, <u>The Irrepressible Myth of Erie</u>, 87 Harv. L. Rev. 693, 724-25 (1974).

In contrast, "a substantive rule is concerned with the channeling of behavior outside the courtroom." <u>Barron</u>, 965 F.2d at 199. Substantive rules "are directed at individuals and governments and tell them to do or abstain from certain conduct on pain of some sanction. Substantive rules are based on legislative and judicial assessments of the society's wants and needs, and they help to shape the world of primary activity outside the courtroom." Wells, <u>supra</u>, at 504. Ely elaborates upon this idea:

> The most helpful way . . . of defining a substantive rule . . . is as a right granted for one or more nonprocedural reasons, for some purpose or purposes not having to do with the fairness or efficiency of the litigation process. Thus, in attempting to give content to the notion of substance, the literature has focused on those rules of law which characteristically and reasonably affect people's conduct at the stage of primary private activity.

Ely, <u>supra</u>, at 725 (internal citations and quotations omitted).

In short, although the distinction between substance and procedure is not always clear, we can distinguish a substantive rule from a procedural rule by examining the language and the policy of the rule in question. If these inquiries point to achieving fair, accurate, and efficient resolutions of disputes, the rule is procedural. If, however, the primary objective is directed to influencing conduct through legal incentives, the rule is substantive.

<u>Sims v. Great Am. Life Ins. Co.</u>, 469 F.3d at 882-83 (alterations in original)(footnote omitted).

In <u>Sims v. Great American Life Insurance Co.</u>, the Tenth Circuit applied the substance/procedure distinction to an Oklahoma statute that required the use of seatbelts, but excluded evidence regarding the use or non-use of seatbelts in civil suits in the state. <u>See</u> 469 F.3d at 883-84 (citing Okla. Stat. tit. 47, § 12-420). Starting with rule 401 and concluding that <u>Erie</u> did not apply, and then looking to Oklahoma law to determine whether the law was procedural or substantive, but not finding Oklahoma cases on point, the Tenth Circuit surveyed general statements about the law's purposes. <u>See</u> 469 F.3d at 884. The Tenth Circuit concluded

that, "[w]hile not completely clear, the language in [the Oklahoma case law] suggests that § 12-420 reflects substantive state policy to the extent that drivers and passengers, while required by law to wear their seat belts, should not be penalized, through connotations of fault, beyond a small statutory fine."  469 F.3d at 884-85.  Unlike a procedural rule, the Oklahoma statute was "not concerned with how seat-belt evidence might affect the accurate resolution of litigated disputes . . . [or] with the efficient resolution of disputes."  469 F.3d at 885.  Rather, the Tenth Circuit concluded that "the rule was designed to protect drivers from being blamed in a court of law for failure to wear a seat belt."  469 F.3d at 885.

Following the Tenth Circuit's framework, the Court starts with rule 401.  Although the Tenth Circuit has previously stated in Sims v. Great American Life Insurance Co. that rule 401 does not require an Erie analysis, see 469 F.3d at 881 n.6 (noting that "Rule 401 has not been amended since the Federal Rules of Evidence were originally enacted," and, thus, "it is clearly the result of an Act of Congress"), rule 401 was amended in 2011 "as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules," Fed. R. Evid. 401, advisory committee notes to the 2011 Amendments.  Compare Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action"), with Act to Establish Rules of Evidence for Certain Courts and Proceedings, Pub. L. 93-595, § 1, 88 Stat. 1931.  ("'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").  The changes were "intended to be stylistic only," and there was "no intent to change any result in any ruling on evidence admissibility."  Fed. R. Evid. 401, advisory

committee notes to the 2011 Amendments.   The Court must consider whether the 2011 amendment was adopted under the Rules Enabling Act.   See James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1218 (10th Cir. 2011)(explaining that the "Federal Rules of Evidence include provisions adopted by Congress and provisions adopted by the Supreme Court under the Rules Enabling Act," and noting that rule 701(c) of the Federal Rules of Evidence was "not adopted as a statute," but "under the Rules Enabling Act").

Although the 2011 amendments to the Federal Rules of Evidence purport to be "stylistic only," the amendments took effect under the Rules Enabling Act.   See Federal Evidence Review, Federal Rules of Evidence -- 2011 Amendment to Restyle the Federal Rules of Evidence, available at federalevidence.com/node/1051/#JCUS (last visited Aug. 30, 2014)(stating that the "restlying amendments were recommended by the U.S. Supreme Court and committees of the U.S. Judicial conference," and that the proposal was "considered under the Rules Enabling Act, which authorizes the Supreme Court to promulgate new rules of evidence which shall take effect unless Congress takes other action").   Thus, the Court must analyze the admissibility of the panel's decision under Erie, see Kechi Tp. V. Freightliner, LLC, 592 F. App'x 657, 672-73 (10th Cir. 2014)(unpublished)("We have explained that Rule 701(c) is covered by the Erie doctrine, as it was added to the Rules by amendment under the Rules Enabling Act, 28 U.S.C. § 2072, and was therefore not an act of Congress outside Erie's scope."), and, more specifically, the concurring opinion of the Honorable John Paul Stevens, Associate Justice of the Supreme Court, under Shady Grove Orthopedic Assoc. v. Allstate Ins. Co., 559 U.S. 393 (2010)("Shady Grove") -- "the most recent Supreme Court case interpreting how to apply rules adopted under the Rules Enabling Act in a diversity case . . . ."   James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d at 1218.   See id. at 1217 (explaining that, in Shady Grove, "Justice Scalia wrote for a four-justice

plurality holding that" rule 23 of the Federal Rules of Civil Procedure applied, rather than a New York statute that would have barred the suit, while "Justice Ginsburg wrote for the four dissenters," and "Justice Stevens concurred, and the Tenth Circuit has understood his concurrence to be the controlling opinion").  Justice Stevens described a two-step framework to resolve an alleged conflict between a federal rule under the Rules Enabling Act and state law:

> First, the diversity court "determine[s] whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law."  Shady Grove, 130 S.Ct. at 1451 (quotations omitted).  "In some instances, the plain meaning of a federal rule will not come into direct collision with the state law, and both can operate."  Id. (quotations omitted).  In other words, the first step is to determine whether the federal rule and state law conflict.

> Second, if applying the federal rule and state law results in a "direct collision, the court must decide whether application of the federal rule represents a valid exercise of the rulemaking authority . . . [under] the Rules Enabling Act." Id. (quotations and citation omitted).  "That Act requires, inter alia, that federal rules 'not abridge, enlarge or modify any substantive right.'"  Id. (quoting the Rules Enabling Act, 28 U.S.C. § 2072(b)).

James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d at 1218 (emphasis in original).

Applying Justice Stevens' frame work, the Court concludes that federal law and N.M. Stat. Ann. § 41-5-20 conflict and that the application of federal law would abridge a substantive right.  First, N.M. Stat. Ann. § 41-5-20(D) precludes the admission of panel reports.  Federal evidentiary rules contain no such prohibition.  While a panel report may, at first blush, appear to be comparable to an expert report, which is inadmissible hearsay, see, e.g. Skyline Potato Co. v. Hi-Land Potato Co., CIV 10-0698 JB/RHS, 2013 WL 311846, at *15 (D.N.M. Jan. 18, 2013) (Browning, J.)(excluding an expert's report, because "[t]he report is a written document that [the expert Westly] Wellborn prepared outside of the court and contains Wellborn's statement, which [the defendant and third-party defendant] do not dispute they are offering for the truth of what the statements assert"); United States v. Mirabal, No. CR 09-3207 JB, 2010 WL 3834072, at *4

(D.N.M. Aug. 7, 2010)(Browning, J.)(concluding that the expert report was inadmissible, and noting that, although inadmissible, "[the expert] could rely upon that report, because the materials that form the basis of an expert opinion need not, themselves, be admissible . . . ."), panel reports are admissible under rule 803(8)(A)(iii) of the Federal Rules of Evidence as factual findings from a legally authorized investigation, see Fed. R. Evid. 803(A)(iii) (noting a hearsay exception for "[a] record or statement of a public office if . . . it sets out . . . in a civil case . . . , factual findings from a legally authorized investigation; and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness").

In Wray v. Gregory, the United States Court of Appeals for the Ninth Circuit, in an opinion written by the Honorable Linda Hodge McLaughlin, United States District Judge for the Central District of California, sitting by designation, noted that findings by a Nevada medical screening panel may be admissible as a public record, but that "the record on appeal [was] not sufficiently complete to determine whether the public record exception applies." 61 F.3d at 1420 n.1 (McLaughlin, J., concurring). In Daigle v. Maine Center, Inc., 14 F.3d 684 (1st Cir. 1994), the United States Court of Appeals for the First Circuit noted, in an opinion that the Honorable Bruce M. Selya, United States Circuit Judge for the First Circuit, wrote, and Senior Judge Coffin and Judge Cyr joined, that admitting the results from a Maine medical screening panel into evidence was not inconsistent with the Federal Rules of Evidence, because they may be admissible under rule 803(8) as a public record. See 14 F.3d at 690 n.6. Similarly, reports and decisions by New Mexico medical screening panels qualify as public records under rule 803(8)(A)(iii).

First, a public office created it, even though the panel members may be private doctors and lawyers. "Rule 803(8) does not require a public official to make the record." United States

v. Cent. Gulf Lines, Inc., 747 F.2d 315, 319 (5th Cir. 1984).  A medical panel constitutes a

"'quasi-public entity' created to assist the government," Erickson v. Baxter Healthcare, Inc., 151

F. Supp. 2d 952, 966-67 (N.D. Ill. 2001)(Bucklo, J.)(quoting Pub. Citizen v. DOJ, 491 U.S. 440,

460 (1989))(concluding that the National Academy of Sciences -- a private entity -- can create a

public record), and which "is under the close direction and control of the government . . . with a

continuing legal mandate to produce reports at the behest of the government," Watts v. City of

Hartford, No. CIV 00-0681 RNC, 2004 WL 717132, at *4 n.9 (D. Conn. Mar. 31,

2004)(Chatigny, J.).  For example, the Tenth Circuit indicated that an order by the Oklahoma

State Board of Medical Licensure and Supervision may be admissible as a public record even

though it is composed of seven licensed physicians and two laypersons.  See Meyer v. Gibson,

17 F. App'x 821, 823 & n.1 (10th Cir. 2001)(unpublished).  Here, the New Mexico Medical

Review Commission organizes the panels, see N.M. Stat. § 41-5-14(A) ("The function of the

New Mexico medical review commission is to provide panels to review all malpractice claims

against health care providers covered by the Medical Malpractice Act . . ."), even though each

panel consists of three doctors and three lawyers, and the Director of the Commission, or his or

her delegate, sits on each panel and serves as its chairman, see N.M. Stat. Ann. § 41-5-17(F)

("The director of the commission or his delegate, who shall be an attorney, shall sit on each

panel and serve as chairman.").  In each case, the panel must make a decision that the chairman

signs and must send a report to the healthcare provider's professional licensing board.  See N.M.

Stat. Ann. § 41-5-20(C)-(D).  The panels, consequently, assist the State in regulating healthcare

providers by informing professional licensing boards of claims against providers and of the

validity of those claims.  The State of New Mexico, thus, creates the medical panels; they act

under the State's direction; and they make decisions and reports as the State mandates.

Accordingly, medical panels are quasi-public entities that can create public records for rule 803(8) purposes.

Additionally, a legally authorized investigation created the Results of Panel Hearing, and they are factual findings.  New Mexico law gives the panel authority to conduct an evidentiary hearing, to request evidence and witnesses, and to make a decision.  See N.M. Stat. Ann. § 41-5-19 (providing panel procedures); id. § 41-5-20 (stating what decisions a panel must make).  The panel's decision is also a factual finding for rule 803(8) purposes.  The term factual findings should be construed broadly to include conclusions and opinions.  See Perrin v. Anderson, 784 F.2d 1040, 1046-47 (10th Cir. 1986)("Courts have construed this term broadly, however, and regularly have admitted conclusions and opinions found in evaluative reports of public agencies.")  As the Supreme Court has held, factual findings under rule 803(8) include "factually based conclusions or opinions."  Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 162 (1988).  A panel's decision, which may include a mere liable or not liable determination, is considered a factual finding, even if it constitutes more of an ultimate conclusion or opinion than a pure factual determination.   The Results of Panel Hearing is, consequently, admissible under rule 803(8), even though it is inadmissible under New Mexico law.  Because federal and state law conflict, Justice's Stevens' first prong is satisfied.  Turning to the second prong, as the Court explains below, New Mexico's inadmissibility rule is a substantive rule, creating substantive rights, and not merely a procedural one.

There is not much case law describing subsection (D) of N.M. Stat. Ann. § 41-5-20 or the purpose behind the medical review commission, and the application of subsection (D) in a diversity case in federal court appears to be a question of first impression.  In Southwest Community Health Services v. Smith, 1988-NMSC-035, 755 P.2d 40, the Honorable Tony

Scarborough, then-Chief Justice for the Supreme Court of New Mexico, wrote a dissenting opinion related to the majority's discussion of N.M. Stat. Ann. § 41-9-5, which dealt with peer review panel confidentiality.   See 1988-NMSC-035, ¶ 23 (Scarborough, C.J., dissenting).   He compared the peer review confidentiality provisions to N.M. Stat. Ann. § 41-5-20:

> In St. Vincent Hospital v. Salazar, 95 N.M. 147, 619 P.2d 823 (1980), we upheld a privilege similar to that of Section 41-9-5 which was conferred by the Medical Malpractice Act, NMSA 1978, Section 41-5-20 (Repl. Pamp. 1986).  There, we upheld the statutory privilege to the extent it protected medical review panel "deliberations and any report made by the panel." St. Vincent, 95 N.M. at 148, 619 P.2d at 824.  Although the privilege which we upheld in St. Vincent pertained to deliberations and reports of medical review panels (as contrasted with the deliberations and reports of peer review organizations), the history of the medical review process is instructive.  Since 1976, 732 cases have been resolved following a medical review panel hearing.  Of these cases, only 143 resulted in litigation.  It is clear that activity of the Legislature in the area of medical malpractice has resulted in the early conclusion of hundreds of malpractice lawsuits.  Similarly, peer review is intended to reduce the number of cases of medical malpractice by identifying and eliminating incompetent physicians.  Consequently, I believe that we should uphold Section 41-9-5 to the same extent we upheld Section 41-5-20.

1988-NMSC-035, ¶ 26 (Scarborough, C.J., dissenting).  Chief Justice Scarborough's discussion of § 41-5-20 thus shows that part of the policy behind the medical review panels is to reduce the number of medical malpractice lawsuits.  At the same time, the Medical Malpractice Act seeks to assist plaintiffs who have meritorious medical malpractice claims; for example, § 41-5-23 provides that, when a panel finds in favor of a plaintiff, the "panel, its members, the director and the professional association" will help the patient "in retaining a physician qualified in the field of medicine involved, who will consult with, assist in trial preparation and testify on behalf of the patient . . . ."  N.M. Stat. Ann. § 41-5-23.  The quid pro quo, probably to the trial lawyers, was that nothing that occurred at the panel would be admissible in court.

The New Mexico panel scheme, however, lacks the sharp teeth of other states' medical panels.  See Jean Macchiaroli Eggen, Medical Malpractice Screening Panels: an Update and

Assessment, 6. J. Health & Life Sci. L. 1, 13 (2013)(noting that the "admissibility of panel findings gives a panel statute the teeth that it otherwise may lack as a nonbinding device"). Some states permit its medical panel's findings to be admitted in a subsequent lawsuit. See, e.g. Neb. Rev. Stat. § 44-2844(2) ("The report or any minority report of the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law . . . ."); Kan. Stat. Ann. § 65-4904(c) ("The written report of the screening panel shall be admissible in any subsequent legal proceeding . . . ."). The New Mexico scheme does not. See N.M. Stat. Ann. § 41-5-20(D) ("The report of the medical review panel shall not be admissible as evidence in any action subsequently brought in a court of law."). Unlike other state's statutory schemes, which discourage subsequent suits after a panel finds against the claimant, New Mexico creates no such disincentive. Indeed, from 1976-1990, New Mexico panels found no liability in 1,022 cases; of those cases, only forty-two percent were dropped thereafter, while over thirty-six percent resulted in settlements. See Jona Goldschmidt, Where Have All the Panels Gone? A History of the Arizona Medical Liability Review Panel, 23 Ariz. St. L.J. 1013, 1090 (1991). A panel's no-liability finding does not, thus, preclude subsequent lawsuits.

Rather than weeding out frivolous lawsuits, as some states' panel schemes are aimed at doing, New Mexico's scheme focuses on informing parties of the strength of their cases and assisting claimants that have a meritorious case, while at the same time not too severely deterring plaintiffs from filing suit. After learning that a panel thinks a claimant's case lacks merit, the claimant may -- as forty-two percent of no-merit claimants between 1976 and 1990 did -- decide to drop his or her case. See Jona Goldschmidt, supra, at 1090. On the other hand, if the claimant decides to press forward with his or her case, the panel's no-liability finding will not adversely affect his or her lawsuit in any way. New Mexico's panel scheme appears to be less focused on

weeding out frivolous cases while more focused on informing claimants about their case's merit and assisting claimants whose case the panel decides has merit. With that purpose and that focus, the Court concludes that New Mexico's non-admissibility law is substantive rather than procedural.

In <u>Bullock v. Wayne</u>, 623 F. Supp. 2d 1247 (D. Colo. 2009), the Honorable Philip A. Brimmer, United States District Judge for the District of Colorado, considered whether a Colorado statute excluding evidence was procedural or substantive for the purpose of determining whether a federal court should apply the rule in defining relevant evidence under rule 401. <u>See</u> 623 F. Supp. 2d at 1254-55. Colo. Rev. Stat. § 42-4-1713 "excludes evidence of a conviction of certain traffic infractions," and, because there were no Colorado cases discussing the purpose of the statute, Judge Brimmer considered similar statutes from other states. 623 F. Supp. 2d at 1255-56. For example, he pointed to a similar statute in Minnesota, and the Supreme Court of Minnesota's determination that "'[i]t is a matter of common knowledge, and was so at the time of the enactment of the statute in question, that often citizens will plead guilty to minor offenses under the traffic act rather than suffer loss of valuable time and the expense of a trial.'" 623 F. Supp. 2d at 1256 (quoting <u>Warren v. Marsh</u>, 11 N.W.2d 528, 531 (Minn. 1943)). The Supreme Court of Minnesota also observed that

> the legislature apparently concluded that a plea of guilty should not prejudice one in any way in any civil proceeding, even one involving the same facts out of which the violation of the traffic act arose. Moreover, distinctly different issues arise in the civil case. The issues of negligence, contributory negligence, and the proximate relation of the violation of the statute to the accident are not involved in the criminal proceeding, whereas they are important issues in the civil case.

<u>Bullock v. Wayne</u>, 623 F. Supp. 2d at 1256 (quoting <u>Warren v. Marsh</u>, 11 N.W.2d at 531).

Judge Brimmer explained that the Colorado statute was substantive and not procedural, and,

thus, concluded that federal courts should consider Colorado's statute excluding minor traffic

infractions when analyzing whether evidence is relevant under rule 401:

> As <u>Warren</u> noted, traffic infractions tend to be minor in nature, informally adjudicated, and often uncontested.  The Colorado legislature presumably did not want these relatively small infractions to have grave consequences in civil actions where significantly more could be at stake.  Section 42-4-1713 also ameliorates docket congestion in traffic courts; were traffic convictions to carry with them the threat of res judicata, the incentive to fight a traffic ticket would grow dramatically and, along with it, the caseload of traffic courts.  <u>See</u> <u>Thurmond v. Monroe</u>, 159 Ill. 2d 240, 201 Ill. Dec. 112, 636 N.E. 2d 544, 548 (1994)(declining to give preclusive effect to traffic court conviction, noting that "applying collateral estoppel would make traffic court an integral part of a civil action and might have a substantial impact on traffic court proceedings").
>
> Therefore, I find that section § 42-4-1713 of the Colorado Revised Statutes, much like the statute in <u>Sims</u>, was not concerned with how evidence of traffic convictions might affect the accurate resolution of litigated disputes or with the efficient resolution of disputes.  Rather, § 42-4-1713 was designed to protect drivers from the preclusive effect that evidence of a traffic conviction may have in subsequent civil litigation.  As a result, § 42-4-1713 is a substantive rule which is applicable in diversity cases in federal court.

<u>Bullock v. Wayne</u>, 623 F. Supp. 2d at 1256 (footnote omitted).

Similarly, the law excluding seat-belt evidence at issue in <u>Sims v. Great American Life</u>

<u>Insurance Co.</u> was substantive, because it was trying to eliminate the possibility of a contributory

or comparative fault defense.  In effect, it eliminated an entire defense and made seat belt use or

non-use irrelevant for negligence cases.  The Tenth Circuit explained that

> [t]he rule is not concerned with how seat-belt evidence might affect the accurate resolution of litigated disputes.  Nor is it concerned with the efficient resolution of disputes.  To the contrary, the rule was designed to protect drivers from being blamed in a court of law for failure to wear a seat belt.

<u>Sims v. Great Am. Life Ins. Co.</u>, 469 F.3d at 885.  Further, the Supreme Court of Oklahoma had

held that the statute precluded the "introduction of evidence of the use or nonuse of seat belts to

support a claim of negligence in a wrongful death action," and the Tenth Circuit said the law did

not apply in a case not involving a claim of negligence.  469 F.3d at 885.  The Tenth Circuit

ultimately held, however, that the statute did not apply in that case, because the statute applied only to negligence cases, and because, there, the proponent attempted to introduce evidence that the driver did not use his seatbelt to establish the driver's state of mind to suggest that he was suicidal.  469 F.3d at 885-86.

The Court concludes that New Mexico's statute barring evidence of the panel's report is substantive and not procedural.[9]  The New Mexico statute is not focused on reaching accurate results at trial, but on regulating and affecting the parties' conduct.  If panel reports were admissible, litigants would fight harder before the panel.  Having a report from several experts in the medical profession opining on whether a plaintiff's case has merit would be extremely persuasive to a lay jury, especially if the jurors lack expertise in the medical field.  See Nicole L. Kaufman, The Demise of Medical Malpractice Screening Panels and Alternative Solutions Based on Trust and Honesty, 28 J. Legal Med. 247, 256 (2007)(noting that "[t]he stakes are high" when a panel decision is admissible, because "the jury is likely to attach significant weight to [the] . . . panel determination").  By prohibiting the panel reports' admissibility, the parties will not fight as hard at the panel stage, because the panel's determination will not affect their rights down the road.  For example, the Court of Appeals of New Mexico noted that "the Legislature intended the

_____

[9]In considering whether N.M. Stat. Ann. § 41-5-20(D) is substantive or procedural, the Court has looked at similar statutes creating medical review panels from other states.  While not particularly enlightening to assist in determining whether New Mexico's provision is substantive or procedural, it is interesting to note that most of the states that have similar statutory schemes involving medical review panels do not prohibit the panels' decisions from being introduced in a subsequent case.  Six states -- Hawaii, Florida, Montana, New Mexico, Utah, and Wyoming -- prohibit the introduction of the panel decision, report, or reasoning as evidence in subsequent cases, see Jean Macchiaroli Eggen, Medical Malpractice Screening Panels: An Update and Assessment, 6 J. Health & Life Sci. L. 1, 16 (2013), but the Court could not locate any decisions from these states discussing whether a federal court would apply the state's rule excluding the evidence.  On the other hand, eleven states -- Alaska, Delaware, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Nebraska, New Hampshire, and Virginia -- "allow the panel decision to be admitted at the subsequent trial of the action, with some states requiring that the panel decision be unanimous as a prerequisite to admissibility."  Eggen, supra, at 13.

Commission hearings to be conducted in an atmosphere free of the intimidations that may accompany a court setting."   Salazare v. St. Vincent Hosp., 1980-NMCA-095, ¶ 12.   New Mexico's inadmissibility rule, thus, permits parties to receive an informed determination on the validity of the case without having to expend the time and resources that would be necessary to vigorously litigate their claim.   Additionally, New Mexico's statute does not discourage plaintiffs from filing suit in court.   While a no-merit panel decision may inform a plaintiff that his or her claim lacks merit, the plaintiff is free to pursue the claim without fearing any detrimental effect that might occur from the panel's decision.   If a panel found that the plaintiff's case lacked merit, however, and that finding was admissible in trial, the plaintiff -- or the plaintiff's potential lawyer -- might think twice about pursuing the case.   As the Court has noted, a panel of medical experts finding that a plaintiff's case lacks merit would be extremely persuasive to a jury, and might create a substantial -- if not insurmountable -- obstacle to the plaintiff at trial.   If a panel's no-merit finding were admissible in court, the plaintiff may decide to forego the claim that he or she may have pursued but for the panel decision.   The New Mexico statute is structured in such a way to prevent this result and not to deter plaintiffs from pursuing their claims despite unfavorable panel decisions.   Statistics show that the statute's purpose is being given effect. From 1976 to 1990, 1022 cases resulted in a no-liability finding; yet, only forty-two percent of those cases were dropped after that finding.   See Jona Goldschmidt, supra, at 1089.   This statistic means that around fifty-eight percent -- over half -- of no-liability cases continued to court. Furthermore, these cases were not completely without merit.   Of the 1022 no-liability cases, over thirty-six percent resulted in settlements.   See Jona Goldschmidt, supra, at 1089.

Similar to the Oklahoma statute excluding evidence of the use or non-use of seatbelts, and the Colorado statute excluding evidence of minor traffic infractions, New Mexico's

provision attempts to alter behavior.  In Oklahoma, the law was primarily aimed at altering behavior by encouraging people to use their seat belts while not penalizing them "though connotations of fault, beyond a small statutory find."  <u>Sims v. Great Am. Life Ins. Co.</u>, 469 F.3d at 885.  In Colorado, the law was primarily aimed at encouraging people to not fight traffic tickets.  <u>See</u> <u>Bullock v. Wayne</u>, 623 F. Supp. 2d at 1256.  Here, the Medical Malpractice Act, as a whole, is intended to alter behavior by informing claimants of their case's validity, encouraging claimants with meritorious claims to pursue them, and not to completely dissuade claimants with non-meritorious claims -- or at least claims which a panel found to be non-meritorious -- from pursuing their claims without adverse effect from the panel decision.  Like the Oklahoma law, the New Mexico statute is aimed at affecting litigants' behavior outside the courtroom -- dissuading non-meritorious claims and encouraging settlement -- while not affecting the parties' rights or case at trial.  Similar to the Colorado law, the New Mexico statute is crafted in such a way to discourage costly and vigorous litigation.  The Colorado law discourages people from fighting traffic tickets by assuring them that the traffic-ticket determination will not affect subsequent litigation, and the New Mexico statute discourages litigants from vigorously fighting at the panel stage by assuring them that a panel loss will not affect the subsequent litigation.

Furthermore, disregarding the New Mexico's statute and admitting the panel's decision would undermine "<u>Erie</u>'s twin goals of discouraging forum shopping and avoiding inequitable administration of the law."  <u>Jones v. Krautheim</u>, 208 F. Supp. 2d 1173, 1175 (D. Colo. 2002)(Krieger, J.)(citing <u>Walker v. Armco Steel Corp.</u>, 446 U.S. 740, 752-53 (1978); <u>Hanna v. Plumer</u>, 380 U.S. 460, 468 (1965)).  By admitting the panel decisions in federal court, but not in state court, plaintiffs may try even harder than they already do to be in state court.[10]

---

[10]The Court has previously noted plaintiffs' preference to state court over federal.

Additionally, based on the impact that such a report may have on a jury's determination, an identical case may result in a favorable judgment for the plaintiff in state court, but not in federal.  Because admission of the panel report would undermine the entire statutory scheme, would encourage forum shopping, and may result in differing outcomes based solely on whether the case is in state or federal court, the Court concludes that the statute is substantive and that it binds the Court.

Finally, the Court's decision is in line with at least one other court's determination whether the admissibility rules concerning a medical screening board's findings are procedural or substantive.  In Daigle v. Maine Medical Center, Inc., the First Circuit held that Maine's medical panel admissibility rule was substantive and that, under Erie, federal courts were bound to follow it.  Maine's statute provided that, if the panel's findings were unanimous, they were

_____

> Plaintiffs prefer to argue in front of state judges, who are often elected, rather than appointed, who and often do not have law clerks.  They also prefer state juries, who are often selected from driver-license registries, to federal juries, who are often selected from voter-registration rolls.  Additionally, perhaps as a result of the greater influence of trial lawyers organizations on state legislatures and judiciaries than on their federal counterparts -- for one thing, state judges are often not life-tenured -- or perhaps because national corporate defendants have a greater ability to exert influence in Washington than in the fifty capitals of the states in which they do business, procedural practice has diverged in a number of ways between the federal and state courts.  These divergences almost always fall in the same direction: state courts favor plaintiffs while federal courts favor defendants.  Federal pleading standards are often higher, . . . ; rule 11's demands are more stringent, and its sanctions harsher, than many of its state counterparts; federal courts require mandatory disclosure of certain information at the front end of discovery; federal courts are more apt to grant summary judgment, usually in favor of defendants; federal courts are less liberal in admitting expert testimony at trial; and, if a plaintiff is lucky enough [to] earn a favorable verdict but is unhappy with the figure on the verdict form, the Supreme Court, unlike many state courts, does not countenance additur.

Aguayo v. AMCO Ins. Co., No. CIV 14-0400 JB/KBM, 2014 WL 5859098, at *52 n.18 (D.N.M. Oct. 31, 2014)(Browning, J.)(citations omitted).

admissible in subsequent court actions.  See Me. Rev. Stat. tit. 24, § 2857, invalidated by Smith

v. Hawthorne, 892 A.2d 433 (Me. 2006).  In Daigle v. Maine Medical Center, Inc., the plaintiff

argued that, even though the medical panel unanimously found against her, because the case was

in federal court, federal evidentiary rules applied, making the findings inadmissible as hearsay.

See 14 F.3d at 689.  The First Circuit disagreed.

> The evidentiary provisions of Maine's Health Act are . . . bound up with the
> state's substantive decision making -- in this instance, the state's choice to
> encourage early, inexpensive resolution of medical malpractice claims.  As
> observed by Maine's highest court in Sullivan[ v. Johnson, 628 A.2d 653
> (Me. 1993)], directing that unanimous Findings be admitted "without
> explanation," thereby circumventing a replay of the screening proceeding, is a
> rational means of ensuring that panel proceedings will not become merely a dress
> rehearsal, but will serve to encourage final dispositions without the need for jury
> trials.  See Sullivan, 628 A.2d at 656.  Since the federal Evidence Rules governing
> hearsay and impeachment do not seek to displace the Health Act's policy of
> limiting frivolous malpractice suits, the federal rules and the state statute can
> peacefully coexist, each operating within its own sphere of influence.
>
> In short, we see no conflict.  Indeed, a refusal to give effect to the Health Act's
> evidentiary provisions would disserve Erie principles by undercutting Erie's twin
> goals of discouraging forum shopping and eliminating inequitable administration
> of the law as between federal and state courts.

Daigle v. Me. Med. Ctr., Inc., 14 F.3d at 689-90 (citations omitted)(footnote omitted).

    While New Mexico's statute differs from Maine's, in that it calls for inadmissibility as

opposed to admissibility, the Court concludes that it too concerns substantive law which the

Court is bound to apply.  Admitting the panel's decision -- or more precisely, considering it in

deciding the Motion to Set Aside Clerk's Entry of Default -- would undermine New Mexico's

statutory scheme.  The state evidentiary rule -- prohibiting admission of panel decisions -- is so

closely tied with the state's substantive decision making in creating the medical panels that to

ignore it would be to undermine the entire scheme.  Accordingly, the Court finds that N.M. Stat.

Ann. § 41-5-20(D) is a substantive rule, and the Court will apply it in this diversity action.

3.      **The Court Determines That Lindsey Has a Meritorious Defense.**

Even though the Court will not consider the medical panel's decision, the Court concludes that Lindsey has presented evidence of a meritorious defense.  Several cases from the Tenth Circuit in a related context -- determining whether to set aside a default judgment under rule 60(b) -- discuss the meritorious defense prong and help inform the standards that the Court should apply in determining whether to set aside the entry of default under rule 55.

The first principle is that, to establish a meritorious defense, a movant must do more than make conclusory arguments.  In Gomes v. Williams, 420 F.2d 1364, 1366 (10th Cir. 1970), the defendant asserted only: "We do have a good defense to the claim itself, but especially we have a good defense to any allegation of fraud."  420 F.2d at 1366 (internal quotation marks omitted).  The Tenth Circuit stated that a "[s]uch a bald allegation, without the support of facts underlying the defense, will not sustain the burden of the defaulting party under Rule 60(b)" to reopen a default judgment.  Gomes v. Williams, 420 F.2d at 1366.  "In an attempt to determine the meritorious nature of a defense, the trial court must have before it more than mere allegations that a defense exists."  420 F.2d at 1366.

Second, while a movant requesting a court to set aside a default judgment must do more than make conclusory arguments, the movant may rest on its moving papers or may produce evidence.  In In re Stone, the Tenth Circuit explained that there are "two distinct aspects" to set aside a default judgment under rule 60(b): "justification for relief and a meritorious defense."  588 F.2d at 1319.  The justification element "is litigated on the merits at the hearing on the 60(b) motion."  588 F.2d at 1319.

> For example, a party seeking to establish excusable neglect must plead and prove it.  The opposing party is entitled to present controverting evidence demonstrating the absence of excusable neglect, which evidence may be introduced by way of

> affidavit, deposition, or testimony.  After considering the pleadings and the evidence, if any, the court determines whether excusable neglect has in fact been established.

In re Stone, 588 F.2d at 1319.  On the other hand, "[t]he situation is different with respect to demonstrating a meritorious defense," because the "parties do not litigate the truth of the claimed defense in the motion hearing."  588 F.2d at 1319.

> Rather, the court examines the allegations contained in the moving papers to determine whether the movant's version of the factual circumstances surrounding the dispute, if true, would constitute a defense to the action.  For purposes of this part of the motion, the movant's version of the facts and circumstances supporting his defense will be deemed to be true.  Thus the focus is on the sufficiency of the factual statement contained in the moving papers.  Unlike the simple notice pleading required in original actions, the rule relating to relief from default judgments contemplates more than mere legal conclusions, general denials, or simple assertions that the movant has a meritorious defense.  The rule requires a sufficient elaboration of facts to permit the trial court to judge whether the defense, if movant's version were believed, would be meritorious.

588 F.2d at 1319 (citations omitted).  The Tenth Circuit elaborated that there is not a "single best method of establishing factual allegations sufficient to support a meritorious defense" and that "[f]actual allegations, if otherwise sufficient, are not objectionable because of the means by which they become part of the moving papers.  The allegations may be satisfactorily presented in the written motion itself, in an appended proposed answer, or in attached affidavits."  588 F.2d at 1319-20.

> Inasmuch as the factual allegations presented in the moving papers will be deemed true for purposes of the meritorious defense aspect of the 60(b) motion, normally there will be no need to introduce evidence on meritorious defense.  Occasionally, however, a trial judge may find it useful to take clarifying testimony.  Such a determination is within the trial court's discretion.  Even in this circumstance, the focus will be on the legal sufficiency of the allegations made in the moving papers rather than their truth.

In re Stone, 588 F.2d at 1320 (footnote omitted).

Thus, for establishing a meritorious defense, the Court may consider the evidence that Lindsey has presented -- except for the Results of Panel Hearing -- and the Court may also rest its decision on Lindsey's description of the facts in his Motion to Set Aside Clerk's Entry of Default.  That the Court may consider an attorney's arguments in the briefing demonstrates that the rules of evidence do not apply at this stage of the proceeding.  To support his claim that he has a meritorious defense, Lindsey points out that Upky's primary doctor, Romanelli, continued to administer the antibiotics that Lindsey ordered, stating that the antibiotics that Lindsey ordered were "more than sufficient for covering any potential problems."  Motion to Set Aside Clerk's Entry of Default at 6 (quoting July 1, 2010 Progress Note).  Lindsey asserts that he acted promptly and arranged for continued care for Upky.  Additionally, Lindsey presents evidence that he ordered an appropriate amount of antibiotics.  See July 1, 2010 Progress Note.  The Court is satisfied that Lindsey has done more than make a bald assertion of a meritorious defense; he has explained specific facts which, if a jury believes at trial, will establish that he did not breach the standard of care when he cared for Upky.  Because the Court has concluded that Lindsey did not willfully default, that setting aside the entry of default will not prejudice Upky, and that Lindsey has a meritorious defense, the Court will grant the Motion to Set Aside Clerk's Entry of Default.

## II.   THE COURT WILL GRANT THE MOTION FOR EXTENSION.

Because Lindsey is requesting an extension of time to file an answer after the deadline has already passed, he must establish that he "failed to act because of excusable neglect."  Fed. R. Civ. P. 6(b)(1)(B).  "[A] finding of excusable neglect under Rule 6(b)[(1)(B)] requires both a demonstration of good faith by the parties seeking the enlargement and also it must appear that there was a reasonable basis for not complying within the specified period."  In re Four Seasons

Sec. Law Litig., 493 F.2d at 1290.  See Putnam v. Morris, 833 F.2d at 905 ("[S]ome showing of good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified is normally required."  (internal quotation marks and emphasis omitted)).   Lindsey has established that he mistakenly believed that his counsel received a copy of the Complaint and Summons, and, thus, has established that he acted in good faith and did not willfully default.   Further, once Lindsey's attorneys became aware of the Motion for Default Judgment, they acted promptly -- within eleven days -- to file the Motion for Extension and the Motion to Set Aside Clerk's Entry of Default.   Upky does not fault Lindsey's attorneys in any way.   The reason Lindsey missed the deadline is because of a lay mistake, and the Supreme Court has explained that, "by empowering the courts to accept late filings 'where the failure to act was the result of excusable neglect,' Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 388 (1993)(citation omitted).   See United States v. Torres, 372 F.3d 1159, 1163 (10th Cir. 2004)(extending the rule from Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership to other contexts discussing excusable neglect).   Although "it is well established that inadvertence, ignorance of the rules, and mistakes construing the rules do not constitute excusable neglect for purposes of Rule 6(b)," Quigley v. Rosenthal, 427 F.3d at 1238, the problem here is not that Lindsey's counsel misunderstood unambiguous filing deadline rules, but that Lindsey misunderstood facts -- the possible impact of opting for personal service (his attorney could get nothing from the plaintiff), and mistakenly believing that his counsel also received a copy of the pleadings.   Although this was careless at best, based on the fact that Lindsey's conduct was not

willful, the Court concludes that his conduct is excusable.  Further, the Court has determined that setting aside the entry of default would not prejudice Upky, the effect of which is permitting the parties to continue litigating the case.  To not then permit Lindsey to file an answer would make the Court's determination on the Motion to Set Aside Clerk's Entry of Default meaningless.  The Court will grant the Motion for Extension of Time.

**IT IS ORDERED** that (i) the Plaintiff's Motion for Default Judgment and Request for Evidentiary Hearing, filed December 9, 2013 (Doc. 8), is denied; (ii) Defendant Wayne Lindsey, M.D.'s Motion to Set Aside Clerk's Entry of Default, filed February 10, 2014 (Doc. 13), is granted; and (iii) Defendant Wayne Lindsey, M.D.'s Motion for Extension of Time to File Answer, filed February 10, 2014 (Doc. 12), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James P. Lyle
Law Offices of James P. Lyle P.C.
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

William P. Slattery
Zachary T. Taylor
Hinkle, Hensley, Shanor & Martin LLP
Santa Fe, New Mexico

    *Attorneys for the Defendant*